**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Norma V Jimenez Hernandez, | No. CV-21-00742-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Maricopa County Community College District, | |
| Defendant. | |

This matter arises out of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq*. Plaintiff Norma Hernandez ("Plaintiff") brought claims for employment discrimination, retaliation, and hostile work environment against Defendant Maricopa County Community College District ("MCCCD"). MCCCD has filed a Motion for Summary Judgment (Doc. 62)[1] on all of Plaintiff's claims. The Court must decide whether a triable issue of fact remains for the jury to resolve. For the following reasons, the Court grants summary judgment on Plaintiff's retaliation and hostile work environment claims, but denies judgment on Plaintiff's discrimination claim.

## I.     Background

The Court will first provide an overview of the relevant events that transpired during Plaintiff's employment at MCCCD.

### A.     Plaintiff is Hired

Plaintiff is a Hispanic woman who worked at MCCCD from 2012–2019. (Doc. 62-

---

[1] The matter is fully briefed. Plaintiff filed a Response (Doc. 63) and MCCCD filed a Reply (Doc. 64).

1 at 16, 57–65).  At all relevant times, MCCCD's Chancellor was Dr. Maria Harper-Marinick ("Chancellor Harper-Marinick").  (Doc. 62-1 at 70).  At all relevant times, the President of Estrella Mountain Community College ("EMCC") was Ernie Lara ("President Lara").  (Docs. 62-1 at 59; 62-2 at 82).  Below is a timeline of the various positions Plaintiff held while at MCCCD and her respective supervisors:

> 2012–2013: Plaintiff worked as a temporary grant evaluator at EMCC. (Doc. 62-1 at 57).

> 2013–2014: Plaintiff worked as a one-year faculty member and reported to Dr. Pablo Landeros.  (*Id*. at 58–59, 65).

> 2014–2015: Plaintiff worked as a one-year faculty member and reported to Dr. Landeros.  (*Id*.)

> 2015–2016: President Lara hired Plaintiff to work as a residential faculty member in EMCC's psychology department. (*Id*. at 61).  In that position, Plaintiff was considered a probationary faculty member and so MCCCD's Resident Faculty Policies (*Id*. at 202–305) (the "Faculty Policies") applied to her thereon.  (*Id*. at 65).

> 2016–2018: EMCC's Vice President of Learning, Dr. Rey Rivera, ("Vice President Rivera"), recruited Plaintiff as EMCC's Phi Theta Kappa Advisor / Honors Faculty Director.  (*Id*. at 62).  While in that role, Plaintiff reported to the Dean of Academic Affairs, Dr. Sylvia Orr ("Dean Orr"). (*Id*. at 63–64).

> 2018–2019: Plaintiff returned to full time instruction as a residential faculty member and again reported to Dr. Landeros.  (*Id*. at 65).  Plaintiff's employment contract was not renewed on May 23, 2019.  (Doc. 62-6 at 12).

## B.    MCCCD's Faculty Policies

Plaintiff's employment at MCCCD from 2015–2019 was governed by the Faculty Policies.  Relevant to this matter are the Faculty Policies for contract renewal and conflict management.  (Doc. 62-1 at 65).  The Faculty Policies on contract renewal procedures require probationary faculty members to annually "document their instructional expertise, service to the department/division, college, and district, and professional development" through Individual Development Plans ("IDPs").  (*Id*. at 210).  Each faculty member's

IDPs are evaluated by the Peer Assistance and Review Committee ("PARC") and serve the basis for the PARC's recommendations to the President related to probationary contract renewals. (*Id*. at 223). The PARC's recommendations would either be for "renewal," "renewal with concerns," or "non-renewal." (*Id*. at 225). The President's responses to the PARC's recommendations are governed as follows:

- If the President determines the faculty member should be renewed, the faculty member's employment shall continue for the subsequent academic year. (*Id*. at 227).

- If the President determines that the faculty member should be renewed with concerns, the faculty member's employment shall continue for the subsequent academic year. The faculty member shall work with the Peer Assistance and Review Team to address the identified as concerns. "Failure to address the deficiencies may result in non-renewal in a future year." (*Id*.)

- If the President determines the faculty member should not be renewed, the President shall make such recommendation to the Chancellor in writing and state the reasons for non-renewal. If the Chancellor agrees that the faculty member should not be renewed, the Chancellor or designee must deliver a notice to the faculty member and state the reasons for non-renewal. (*Id*. at 228).

As for conflict management, the Faculty Policies established "Procedures for Grievances or Resolutions of Controversy" that facilitated complaints through four levels. (*Id*. at 259–266). An employee was required to submit her complaint in writing to (1) the employee's immediate supervisor; then (2) the Vice President who is the supervisor of the employee's immediate supervisor; then (3) the President; then (4) the Chancellor. (*Id*. at 259–260).

### C.   Complaints Made by and Against Plaintiff

During the first semester of the 2017–2018 academic year, Plaintiff documented that she met with Dean Orr for a total of thirteen times, which Plaintiff thought was "excessive compared to the previous Honors director and other individuals [Dean] Orr supervise[d]." (Doc. 63-1 at 257). Plaintiff "expressed frustration that [Dean] Orr seemed

to be repeating the same information in meetings after meetings" and that Plaintiff met with her on a weekly versus monthly basis.  (*Id*.)

In January–February 2018, Plaintiff's paychecks were delayed due to a payroll software upgrade and because her contract was not yet processed for that pay period. (*Id*. at 262–284).  Plaintiff contacted Dean Orr for assistance.  (*Id*. at 264).  Plaintiff stated the delay caused her "financial and emotional hardship."  (*Id*. at 262).

In February 2018, Plaintiff sought approval for funding to travel to a conference at Harvard University with Ms. Laura Fry, another MCCCD employee, and three MCCCD students.  (*Id*. at 270–281).  After Plaintiff and Ms. Fry attended the conference, Dean Orr and Vice President Rivera requested supplemental documentation regarding the logistics of the trip and the conference subject matter.  (*Id*.)  Vice President Rivera and Dean Orr were concerned that the funds sought were not proportionate to the undertaken travel.  (*Id*.) Plaintiff and Ms. Fry objected that they were being requested to provide information that was not requested of other MCCCD employees.  (*Id*.)  Plaintiff characterized the "repeated emails for further clarification/ justification" as "nit-picking" and "indications of harassment and discriminatory behavior."  (*Id*. at 275).  Although Plaintiff and Ms. Fry were generally responsive to Vice President Rivera and Dean Orr's emails, there is no evidence in the record showing whether or not they provided the physical documents requested.  (*Id.* at 270–281).

On March 12, 2018, EMCC Academic Advisor Linda Cutright ("Ms. Cutright") lodged a race discrimination, harassment, and retaliation complaint against Plaintiff when Plaintiff accused Ms. Cutright of "fixing" a diversity committee vote so that the "Black History nominee" would win a diversity award.  (Doc. 62-4  at 2–5).  The MCCCD Equal Employment Opportunity Office ("EEO Office") issued a "Report of Findings" (*Id*. at 7–15) finding Ms. Cutright's allegations against Plaintiff were unsubstantiated, but that Plaintiff's emails to Ms. Cutright "were not a professional manner of addressing a workplace dispute."  (*Id*. at 15).

On April 28, 2018, Dean Orr lodged an age discrimination and harassment

complaint regarding allegedly disparaging comments Plaintiff had made (Doc. 62-2 at 130–154). Dean Orr's complaint was based, in part, on Plaintiff's email statement that "D[ean] Orr has been known to be forgetful and several examples can be cited by individuals who work closely with her." (Doc. 63-1 at 271–72). The MCCCD EEO Office issued a "Report of Findings" (Doc. 62-2 at 212–234) finding Dean Orr's allegations against Plaintiff were unsubstantiated, but that Plaintiff's "conduct and inability to resolve conflict with employees is concerning." (*Id*. at 220).

On April 30, 2018, President Lara renewed Plaintiff's contract with concerns for the 2018–2019 academic year and asked that Plaintiff work with the faculty developer and her mentor to develop a plan to address the concerns. (Doc. 62-4 at 29). President Lara sent a follow up email to Plaintiff on May 15, 2018, identifying a list of administrative regulations she had violated. (Doc. 63-1 at 453). The Peer Assistance and Review Team met with Plaintiff to clarify her renewal concerns on October 31, 2018. (*Id.* at 662). Plaintiff received her renewal plan on November 19, 2019. (*Id.* at 662–64).

On September 13, 2018, Plaintiff filed a grievance with Chancellor Harper-Marinick regarding President Lara's renewal decision. (62-5 at 11–13). "The basis for the grievance [was] that Dr. Lara's decision did not specifically identify what concerns [Plaintiff] need[ed] to address for the upcoming academic year[.]" (*Id*. at 11). Chancellor Harper-Marinick denied Plaintiff's grievances because she failed to exhaust the relevant procedures set forth in the Faculty Policies. (*Id*. at 15).

On October 29, 2018, the Plaintiff filed complaint against Vice President Rivera for age, national origin, and sex discrimination as well as retaliation. (*Id*. at 19–25). Plaintiff's claims were found to be unsubstantiated. (Doc. 62-1 at 111). Plaintiff asked for an administrative review of the investigation of her complaint. (Doc. 63-1 at 382).

On November 19, 2018 complaints were filed against Plaintiff alleging she harassed students under Title IX. (Doc. 62-5 at 27–28). The allegations of those complaints were found to be unsubstantiated. (Doc. 63-1 at 611).

/ / /

1

2

3

### D.    Plaintiff's Contract is Not Renewed

On April 10, 2019, the PARC recommended that Plaintiff's contract be renewed with concerns for the 2019–2020 school year.  (Doc. 62-6 at 71).  President Lara issued a "Recommendation for Non-renewal Letter" (*Id*. at 70–71) to Chancellor Harper-Marinick.  Plaintiff met with Chancellor Harper-Marinick before her final determination. On May 23, 2019, Chancellor Harper-Marinick issued her decision not to renew Plaintiff's employment contract.  (*Id*. at 12).  Plaintiff filed a charge with the Equal Employment Opportunity Committee ("EEOC") against EMCC on December 19, 2019.  (Doc. 62-3).

### E.    The Present Matter

The Court construed Plaintiff's Complaint (Doc. 1) to bring claims under Arizona state law, the Higher Education Act, and Title VII.  In its January 11, 2022, Order (Doc. 32) (the "2022 Order"), the Court dismissed with prejudice Plaintiff's claims under state law and the Higher Education Act. (*Id*. at 4–5).  The Court also dismissed with prejudice Plaintiff's Title VII claims against defendant individuals.  (*Id*. at 6).  The only remaining claims in this case are Plaintiff's Title VII claims for discrimination, retaliation, and hostile work environment against MCCCD.  (Docs. 32 at 8; 46).  The Court further settled that Plaintiff may allege Title VII claims based on her race and gender, but not on her religion because her EEOC charge allegations were not related to her religion.  (Doc. 32 at 7–8).

## II.    Legal Standard

A court will grant summary judgment if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A factual dispute is genuine when a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court does not weigh evidence to discern the truth of the matter; it only determines whether there is a genuine issue for trial. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).  A fact is material when identified as such by substantive law.  *Anderson*, 477 U.S. at 248.  Only facts that might affect the outcome of a suit under the governing law can preclude an entry

1 of summary judgment. *Id.*

2   The moving party bears the initial burden of identifying portions of the record,

3 including pleadings, depositions, answers to interrogatories, admissions, and affidavits,

4 that show there is no genuine factual dispute. *Celotex*, 477 U.S. at 323. Once shown, the

5 burden shifts to the non-moving party, which must sufficiently establish the existence of a

6 genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

7 *Corp.*, 475 U.S. 574, 585–86 (1986); *see also Celotex Corp.*, 477 U.S. at 324, (holding the

8 nonmoving party bears the burden of production under Rule 56 to "designate specific facts

9 showing that there is a genuine issue for trial"). The evidence of the non-movant is "to be

10 believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S.

11 at 255. But if the non-movant identifies "evidence [that] is merely colorable or is not

12 significantly probative, summary judgment may be granted." *Id.* at 249–50

13 (citations omitted). "Where the record taken as a whole could not lead a rational trier of

14 fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*,

15 557 U.S. 557, 586 (2009).

16   The Ninth Circuit has cautioned that, "[i]n reviewing motions for summary

17 judgment in the employment discrimination context, a court must 'zealously guard[ ] an

18 employee's right to a full trial, since discrimination claims are frequently difficult to prove

19 without a full airing of the evidence and an opportunity to evaluate the credibility of the

20 witnesses.'" *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019)

21 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004)) (alterations

22 in original); *see also Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1564 (9th Cir. 1994) ("'We

23 require very little evidence to survive summary judgment' in a discrimination case,

24 'because the ultimate question is one that can only be resolved through a 'searching

25 inquiry'—one that is most appropriately conducted by the factfinder.'") (quoting *Sischo-*

26 *Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)).

27 **III.   Discussion**

28   MCCCD seeks summary judgment on all of Plaintiff's remaining Title VII claims,

1   arguing Plaintiff cannot establish *prima facie* cases for discrimination (Doc. 62 at 11–15),

2   retaliation (*id*. at 15–16), or a hostile work environment (*id*. at 16–17).[2]   Plaintiff argues

3   summary judgment is improper because MCCCD has not met its burden to show Plaintiff's

4   claims lack supporting evidence.   Her theory is that the "only serious reason" MCCCD

5   terminated her is because "she would not stop complaining about the discrimination she

6   personally experienced and saw across [MCCCD's campus]."   (Doc. 63 at 2).

7       The Court will discuss Plaintiff's discrimination, retaliation, and hostile work

8   environment claims in turn.

9       **A.   Discrimination – Disparate treatment**

10      Plaintiff's first Title VII claim is for discrimination based on her race (Hispanic)

11  and sex (female).   *See* 42 U.S.C. § 2000e-2(a)(1).   Under the applicable statute of

12  limitations, Plaintiff's discrimination claim is limited in that an unlawful practice must

13  have occurred between February 22, 2019, and December 19, 2019, when Plaintiff filed

14  her Charge of Discrimination with EEOC.   (Doc. 32 at 6–7).   Plaintiff alleges MCCCD

15  discriminated against her when it did not renew her employment contract in May 2019.

16  (Doc. 63 at 12).   Plaintiff argues a disparate treatment theory, claiming she "experience[d]

17  greater scrutiny than her peers and comparators who were not minority women."   (*Id*. at 2).

18  MCCCD contends Plaintiff's claim fails because she cannot show *prima facie* case for

19  discrimination and she cannot show the reasons for her non-renewal were pretextual.

20  / / /

---

[2] MCCCD also contends, for the second time, that Plaintiff's claims should be narrowed in
that any alleged actions by MCCCD prior to the May 2019 non-renewal are time-barred.
(Doc. 62 at 10).   But the Court already addressed this issue in its 2022 Order.   In settling
the correct time limit for filing a Title VII claim in Arizona is 300 days, the Court explained
that "an unlawful practice [in this matter] must have happened between February 22, 2019,
and December 19, 2019, when Plaintiff filed her Charge of Discrimination." (Doc. 32 at
6–7).   The Court went on to clarify that this limitation did not apply to Plaintiff's hostile
work environment claim under the continuing violation doctrine. (*Id*. at 7 (citing *AMTRAK
v. Morgan*, 536 U.S. 101 (2002)).   Plaintiff therefore may rely on her hostile work
environment allegations spanning from September 2017 to her non-renewal in May 2019.
(*Id*. at 7).

To the extent MCCCD seeks to limit Plaintiff's discrimination and retaliation claims to the
February 22–December 19, 2019, period, any such concerns are nonissues because the only
adverse action Plaintiff relies on is her non-renewal in May 2019.   *See infra*
Section III.A, B.

1          **1.      Legal Framework**

2          "To establish disparate treatment under Title VII, a plaintiff must offer evidence

3   that gives rise to an inference of unlawful discrimination, either through the framework set

4   forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of

5   discriminatory intent." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir. 2021);

6   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under either approach,

7   Plaintiff must produce some evidence suggesting that MCCCD's non-renewal was "due in

8   part or whole to discriminatory intent[.]" *Weil*, 922 F.3d at 1002 n.7 (quoting *McGinest*,

9   360 F.3d at 1123); *see also Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir. 2021).

10         The *McDonnell Douglas* burden-shifting framework requires three steps. 411 U.S.

11  at 802–04. First, Plaintiff must meet her initial burden to establish a *prima facie* case of

12  discrimination. *Id*. at 802. At the second step, "[t]he burden of production, but not

13  persuasion" shifts to MCCCD "to articulate some legitimate, nondiscriminatory reason for

14  the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–

15  24 (9th Cir. 2000). If MCCCD does so, then the presumption of discrimination "drops out

16  of the picture." *McGinest*, 360 F.3d at 1123 (quoting *Reeves v. Sanderson Plumbing

17  Prods., Inc.*, 530 U.S. 133, 143 (2000)). Third, the burden shifts back to Plaintiff to show

18  MCCCD's articulated reason is pretextual. *Freyd*, 990 F.3d at 1228.

19         **2.      Plaintiff's *Prima Facie* Case**

20         To establish a *prima facie* case for discrimination under *McDonnell Douglas*,

21  Plaintiff must show: (1) she belongs to a class of persons protected by Title VII; (2) she

22  performed her job satisfactorily; (3) she suffered an adverse employment action; and

23  (4) MCCCD treated her differently than a similarly situated employee who does not belong

24  to the same protected class as her. *Cornwell*, 439 F.3d at 1028 (citing *McDonnell Douglas*,

25  411 U.S. at 802)). This showing "creates a presumption that the plaintiff's employer

26  undertook the challenged employment action because of the plaintiff's race." *Id*. It is

27  undisputed that Plaintiff is a Hispanic woman, and thus a member of a protected classes.

28  It is also undisputed that Plaintiff's employment contract was not renewed in May 2019,

which Plaintiff characterizes as an adverse employment action  (*See generally* Doc. 63 at 12).[3]  *See Williams v. Alhambra Sch. Dist. No. 68*, 234 F. Supp. 3d 971, 980 (D. Ariz. 2017) (finding that non-renewal can be adverse employment action even though school administrators are not entitled to a renewal of their contracts under Arizona law).  However, MCCCD argues Plaintiff cannot establish *prima facie* elements two or three because she was not performing her job satisfactorily and no individuals similarly situated to Plaintiff and outside of Plaintiff's protected class were treated more favorably.  (Doc. 62 at 13–15).

### a.    Job Performance

MCCCD argues it is undisputed that Plaintiff's performance was unsatisfactory because "[she] admits engaging in all the conduct identified in her non-renewal and [her] subjective judgment of her competence does not raise a genuine [issue] of material fact." (*Id*. at 15).  However, the Court finds that this evidence is more relevant to MCCCD's burden to articulate legitimate, nondiscriminatory reasons for Plaintiff's non-renewal at step two of the burden-shifting framework rather than to Plaintiff's *prima facie* case. *See Carr v. Garland*, 2022 WL 17549781, at  *3 (C.D. Cal. Nov. 3, 2022).  The Court will not consider such evidence at step one because to do so "would blur the distinction between a plaintiff's burden to demonstrate qualifications and the employer's responsibility to offer a legitimate basis for not [renewing] the plaintiff."  *Hines v. California Pub. Utilities Comm'n*, 2010 WL 2985536, at *6 (N.D. Cal. July 27, 2010), *aff'd*, 467 F. App'x 639 (9th Cir. 2012).  Indeed, the record shows Plaintiff was promoted yearly and was also chosen for leadership roles, such as EMCC's Honors Faculty Director/ Phi Theta Kappa Advisor and Diversity Committee member.  The Court finds Plaintiff meets *prima facie* element two.

### b.    Treatment of Similarly Situated Employees

The fourth element requires Plaintiff to show MCCCD treated her differently than

---

[3] Although Plaintiff alleged other theories of adverse employment actions in her Complaint, she did not defend those theories in her Response to MCCCD's Motion for Summary Judgment and only relies on her non-renewal.  (*See* Doc. 63 at 9, 12).  Therefore, the Court will limit Plaintiff's claims accordingly.  *See Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (deeming claims "abandoned" that were not raised in opposition to summary judgment motion).

employees outside of her race and sex who were similarly situated to her, yet were given preferential treatment.  *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1015 (9th Cir. 2018).  "[E]mployees are similarly situated to the plaintiff when they 'have similar jobs and display similar conduct.'" *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011) (quoting *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)).  The employees' roles must be similar in material respects, but need not be identical.  *Id.*

In her Response, Plaintiff narrowed her comparators to the following three examples:

> (1)   Unlike Plaintiff, an Anglo male probationary faculty member in the computing division "did not have to wait months for a renewal plan and was able to work with his supervisors to put it together." (Docs. 63 at 14; 63-1 at 26–27).

> (2)   Unlike Plaintiff, an Anglo male employee was permitted to change his supervisory structure to report to Vice President Rivera instead of Dean Orr.  (Doc. 63 at 14).

> (3)   An Anglo female employee sent a mass email documenting her experiences and disparaging Vice President Rivera but, unlike Plaintiff, was renewed and still teaches at EMCC as of Spring 2023. (*Id.* at 15).

It is undisputed that these comparators are not Hispanic women and thus outside of Plaintiff's protected class.  However, MCCCD argues none of these examples are sufficient because the employees work in different departments or roles and were not given preferential treatment.  (Doc. 62 at 13–14).  MCCCD further contends Plaintiff has not adequately cited to the record to prove the basis for her comparators.  (Doc. 64 at 2).

Although the Court agrees Plaintiff has failed to provide any evidentiary support for her second and third comparators,[4] the Court finds the first comparator is sufficient.  The

---

[4] Plaintiff does not cite to anywhere in the summary judgment record to support her arguments as to these comparators.  (*See* Doc. 63 at 14–15).  And, as stated in the Court's Scheduling Order, "[n]o party shall presume the Court will hunt for facts or theories that might support either party's case. The Court will rely solely upon the attached evidence to verify facts asserted in the motion, response, or reply *as identified by a pin cite*." (Doc. 37 at 5 n.1) (emphasis added).

Anglo-male faculty member and Plaintiff have similar jobs because they are both probationary faculty members who are subject to the Faculty Policies. (Doc. 63-1 at 26). The fact that the Anglo-male faculty member taught in the instructional computing department while Plaintiff taught in the psychology department does not materially distinguish their roles. Plaintiff also averred in her deposition that the PARC recommended both she and the faculty member be renewed with concerns in spring 2018, which implies they engaged in similar conduct. (*Id.*)

Furthermore, a reasonable person could find that the Anglo-male faculty member was treated more favorably than Plaintiff. Plaintiff stated in her deposition that the Peer Assistance and Review Team timely met with the Anglo-male faculty member to clarify how he must improve for the following school year in accordance with the Faculty Policies procedures. (*Id.* at 26). (*See also* Doc. 62-1 at 227). By contrast, Plaintiff demonstrated that both she and her supervisor, Dr. Landeros, had to make multiple requests to obtain relevant information and schedule a meeting with the Peer Assistance and Review Team to clarify her renewal concerns (Doc. 63-1 at 480–85), which did not occur until October 31, 2018, well into the following school year. (*See* Doc. 62-5 at 30). Although MCCCD is correct that Plaintiff eventually obtained a meeting (Doc. 62 at 14), Plaintiff's delay as compared to the Anglo male faculty member could signal preferential treatment. Indeed, Plaintiff did not receive a renewal plan until November 19, 2019 (Doc. 62-5 at 30–32), which is seven months after she was renewed with concerns. (Docs. 63-1 at 26; 63 at 14). Whether Plaintiff was treated less favorably than the Anglo-male faculty member when both employees were renewed with concerns is an issue of fact for the jury to resolve. *See Celotex*, 477 U.S. at 322–23.

To summarize, the Court finds MCCCD has failed to negate Plaintiff's *prima facie* case for discrimination. Plaintiff's supporting evidence, although marginal, is sufficient to survive summary judgment. *See Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (holding that a plaintiff's burden at the summary judgment phase stage is "minimal and does not even need to rise to the level of a preponderance of the evidence") (quoting *Wallis*

1    *v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

2                    **3.    MCCCD's Legitimate, Nondiscriminatory Explanations**

3            Moving to the second step of the *McDonnell Douglas* framework, MCCCD must

4    provide a legitimate, nondiscriminatory reason for Plaintiff's non-renewal.  *Chuang*, 225

5    F.3d at 1123–24.  MCCCD provided the following neutral reasons to justify Plaintiff's

6    non-renewal:

8            (1)    Plaintiff "do[es] not understand directives to be professional".
9                   (Doc. 62-6 at 71).  Plaintiff was renewed with concerns in 2018 due
                    to sending unprofessional emails in the 2017–2018 school year, yet
10                  Plaintiff again sent unprofessional emails in two discrimination
                    investigations.  (*Id.*)

12           (2)    The PARC had identified concerns in Plaintiff's IDP, specifically that
                    the "Faculty member's VP or Designee Evaluation" section and
13                  "Faculty Student Evaluations" section "did not focus on the actual
                    classroom evaluation and thus there was little to no reflection as to
14                  what the actual evaluation said about improving teaching." (*Id.*)

15           (3)    Plaintiff did not timely complete a research fellowship she received
16                  hours for in the 2017 fall and 2018 spring semesters.  (*Id.*)  The
                    fellowship was due by July 2018, yet Plaintiff did not submit it until
17                  March 19, 2019.  (*Id.*)

19           (4)    Plaintiff, during her request for administrative review of her
                    discrimination claim against Vice President Rivera, misrepresented
20                  facts about another staff member as having been a victim of
                    discrimination, which also appeared in a student's request for
21                  administrative review in a Title IX case.  (*Id.*)

22   (Doc. 62-6 at 71).  MCCCD has provided evidence reflecting that Plaintiff engaged in at

23   least some of the listed conduct, and so the Court finds these reasons are legitimate.

24   (*See id.* at 10, 16); (*see* Doc. 62-1 at 127–128 (supporting reason two)); (*see* Doc. 62-1 at

25   124–131, 140; 62-6 at 51–63 (supporting reason three)); (*see* Doc. 62-6 at 67 (supporting

26   reason four)).  At minimum, Plaintiff conceded at her deposition that the PARC identified

27   concerns in her IDPs and that that she failed to submit her research fellowship.  (Doc. 62-

28   1 at 127–128, 124–131, 140).  Indeed, it is the burden of production—not persuasion—that

1    shifts to MCCCD at this second step.  *Chuang*, 225 F.3d at 1123–24.  Because MCCCD

2    has met its low burden, the presumption of discrimination "drops out of the picture."

3    *McGinest*, 360 F.3d at 1123 (quoting *Reeves*, 530 U.S. at 143).

4         MCCCD also asserts there is an inference of nondiscriminatory intent because

5    President Lara is (a) the same individual who recommended Plaintiff's hiring and non-

6    renewal; and (b) a member of Plaintiff's protected class as he is a Hispanic man.  (Doc. 62

7    at 13).  "Where the same actor is responsible for both the hiring and the firing of a

8    discrimination plaintiff, and both actions occur within a short period of time, a strong

9    inference arises that there was no discriminatory action." *Bradley v. Harcourt, Brace &*

10   *Co.*, 104 F.3d 267, 270–71 (9th Cir. 1996) (denying summary judgment under the same

11   inference when a supervisor hired an employee and then fired her a year later).  Although

12   this same-actor inference was phrased in terms of "hiring" and "firing," the Ninth Circuit

13   has applied the inference when the same decisionmaker makes similarly negative

14   employment actions.  *See, e.g.*, *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096

15   (9th Cir. 2005) (applying the defense when the same decisionmaker demoted the plaintiff

16   to a lesser role).

17        Because President Lara was the same decisionmaker who recommended Plaintiff's

18   contract renewal and non-renewal within a twelve month period, the Court finds the same-

19   actor inference applies here to negate any discriminatory intent behind Plaintiff's non-

20   renewal.  *See Crudder v. Peoria Unified Sch. Dist. No. 11*, 468 F. App'x 781 (9th Cir.

21   2012) (applying the same-actor inference when a school superintendent initially

22   recommended to the school district governing board that the plaintiff be promoted to a

23   principal position, but then later rescinded his recommendation).  The Ninth Circuit treats

24   the same-actor inference as "neither a mandatory presumption . . . nor a mere possible

25   conclusion for the jury to draw[].  Rather, it is a 'strong inference' that a court must take

26   into account on a summary judgment motion." *Coghlan*, 413 F.3d at 1098 (citing *Bradley*,

27   104 F.3d at 271).

28   / / /

### 4.     Pretext

At the last step of the framework, the burden shifts back to Plaintiff to prove MCCCD's legitimate, neutral reasons are actually a pretextual for discrimination. *Freyd*, 990 F.3d at 1228. Ordinarily, Plaintiff would have to produce "specific and substantial" evidence of intentional discrimination to defeat MCCCD's motion for summary judgment. *Coghlan*, 413 F.3d at 1096. However, when faced with the same-actor inference, Plaintiff's burden of proof is especially steep as she must make "an extraordinarily strong showing of discrimination" to survive summary judgment. *Blair v. Shulkin*, 685 F. App'x 587, 587 (9th Cir. 2017) (citation omitted). Alternatively, "[P]laintiff 'must tender a genuine issue of material fact as to pretext in order to avoid summary judgment.'" *Wallis*, 26 F.3d at 890 (quoting *Steckl v. Motorola, Inc*., 703 F.2d 392, 393 (9th Cir. 1983));

Plaintiff argues MCCCD's second and third reasons for non-renewal are pretextual because they are supported by "paper-thin justifications" and it is unlikely that another employee would be fired for issues with their IDPs and failure to meet fellowship deadlines. (Doc. 63 at 11–12). But Plaintiff "must do more than establish a *prima facie* case and deny the credibility of [MCCCD's] witnesses" to avoid summary judgment. *See Bradley*, 104 F.3d at 270 (quoting *Wallis*, 26 F.3d at 890). The Court finds these arguments alone are insufficient.

However, Plaintiff's pretext challenge to MCCCD's first reason for non-renewal— that is, Plaintiff's "unprofessionalism"—raises a material issue of fact that cannot be properly resolved on summary judgment. (Doc. 63 at 1–2). MCCCD described Plaintiff's actions as unprofessional because "[r]ather than addressing the conflicts through Conflict Management, Plaintiff made inappropriate statements about her colleagues to others, including those who were not in positions of authority to act." (Doc. 62 at 5). Plaintiff contends MCCCD's labelled her actions as "unprofessional" as a euphemism "against minority women when they speak out against discrimination and other unethical behaviors." (Doc. 63 at 2, 9). For support, Plaintiff points to President Lara's deposition testimony, where he explained that Plaintiff's unprofessional conduct continued during the

2018–2019 school year because "[s]he continued to direct comments toward individual and make claims." (*Id*. at 9 (quoting 63-1 at 10)). When asked to expand on what "claims" he was referring to, President Lara clarified that Plaintiff made "claims about being treated unfairly because of her race or her ethnicity" that were "in her mind." (Doc. 63-1 at 10).

President Lara's statements call into question whether he doubted the sincerity of the discrimination claims Plaintiff made during the course of her employment. Plaintiff contends this demonstrates she "was fired because she would not stop complaining about the discrimination she personally experienced and saw across [MCCCD's] campus." (Doc. 63 at 2). MCCCD does not acknowledge, much less rebut, Plaintiffs' challenge to President Lara's deposition testimony in its Reply. (*See generally* Doc. 64). When drawing all justifiable inferences in Plaintiffs' favor, the Court finds that Plaintiff has sufficiently raised a genuine dispute of material fact as to whether MCCCD's reasons for non-renewal was pretextual. *See Wallis*, 26 F.3d at 890. Indeed, discrimination claims involve a "lessened causation standard": a plaintiff need show only that "race, color, religion, sex, or national origin was a motivating factor" for employer's adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013) (quoting 42 U.S.C. § 2000e-2(m)). "[A]n employer's proof that 'other factors also motivated the action' will not defeat the discrimination claim." *Id*. at 364 (Ginsburg, J., dissenting) (quoting 42 U.S.C. § 2000e-2(m)).

Furthermore, whether Plaintiff's contract was not renewed due to her unprofessionalism—as MCCCD argues—or her claims of unfair treatment due to her race and gender—as Plaintiff argues—is for the jury to weigh. *See Jesinger*, 24 F.3d at 1131 (a court does not weigh evidence to discern the truth of the matter; it only determines whether there is a genuine issue for trial). The Court will therefore deny MCCCD summary judgment on Plaintiff's discrimination claim due to issues of fact and credibility. *See Weil*, 922 F.3d at 1002 ("[A] court must 'zealously guard[ ] an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses.'").

### B.     Retaliation

Plaintiff's next Title VII claim is for retaliation.  Under the applicable statute of limitations, Plaintiff's retaliation claim is limited in that an unlawful practice must have occurred between February 22, 2019, and December 19, 2019, when Plaintiff filed her Charge of Discrimination with the EEOC.  (Doc. 32 at 6–7).  Plaintiff argues MCCCD retaliated against her when it did not renew her employment contract in May 2019 after she filed "various internal complaints."  (Doc. 63 at 8).

Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee because he has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing" or "opposed" a practice that Title VII forbids.  42 U.S.C. § 2000e–3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–60 (2006); *see also Scott v. Mabus*, 618 F. App'x 897, 901 (9th Cir. 2015).  Like Plaintiff's discrimination claim, the *McDonnell Douglas* burden shifting framework applies to Plaintiff's retaliation claim.  *See supra* Section III.A(1); *see also Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

### 1.     Plaintiff's *Prima Facie* Case

The first part of the retaliation framework requires an employee to establish a *prima facie* case that: "(1) [s]he engaged in a protected activity; (2) h[er] employer subjected h[er] to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action."  *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  MCCCD concedes that Plaintiff engaged in protected activity when she filed a discrimination complaint with the EEO Office against Vice President Rivera on October 29, 2018 (Plaintiff's "2018 Complaint").[5]  (Doc. 64 at 3).  *See Archuleta v. Corr. Corp. of Am.*, 829

---

[5] Plaintiff also claims, and MCCCD concedes, that Plaintiff engaged in protective activity when she sent Chancellor Harper-Marinick a grievance regarding President Lara's renewal decision.  (Docs. 63 at 8; 64 at 3).  Not so.  Although the grievance referenced discriminatory and retaliatory actions by other employees, "[t]he basis for [Plaintiff's] grievance [was] that Dr. Lara's decision did not specifically identify what concerns [Plaintiff] need[ed] to address for the upcoming academic year[.]" (Doc. 62-5 at 11).  Therefore, the grievance does not constitute protected activity because it functioned as a procedural challenge and did "not allege any discriminatory or harassing conduct that violates Title VII." *Withrow v. Lamb Weston, Inc.*, 2023 WL 5311223, at *(D. Or. July 12, 2023) *report and recommendation adopted*, 2023 WL 5290985 (D. Or. Aug. 16, 2023)

F. App'x 242, 243 (9th Cir. 2020) (holding that "[f]iling an internal complaint pursuant to an established reporting procedure" is a protected activity).  Because Plaintiff broadly claims she engaged in protected activity through "various internal complaints" without identifying any specific complaint (Doc. 63 at 8), the Court will limit her retaliation claim to her 2018 Complaint.  It is also undisputed that Plaintiff's employment contract was not renewed in May 2019, which Plaintiff characterizes as an adverse employment action (Doc. 63 at 8).  At issue is element three: a causal link between Plaintiff's protected activity and her non-renewal.

Under the causation prong in retaliation claims, an employee must prove she would not have suffered an adverse action "but-for" her protected activity.  *Nassar*, 570 U.S. at 362.  This is a stricter standard than that applied in discrimination claims because retaliatory causation is not satisfied when the protected activity is no more than a "motivating factor."  *Id.*  The requisite causal link may be established "by an inference derived from circumstantial evidence, such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."  *Samuels v. UBS Fin. Servs., Inc.,* 2006 WL 1877258, at *2 (9th Cir. July 5, 2006) (citation omitted).  However, if an employee "relies solely on the proximity in time inference to support the causation prong, that proximity in time must be 'very close.'"  *Williams v. Tucson Unified Sch. Dist.*, 316 F. App'x 563, 564 (9th Cir. 2008) (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Plaintiff's attempts to establish causation are insufficient.  Plaintiff argues there is direct evidence of causation because two of MCCCD's reasons for non-renewal expressly reference Plaintiff's protected activities—i.e., Plaintiff was "found to be unprofessional in two separate discrimination investigations" and "misrepresented facts" about a classified staff member in her request for administrative review of her 2018 Complaint.  (Doc. 62-6 at 71).  But these references show, at best, that Plaintiff's protected activity may have been

(citing *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994)).

a motivating factor for her non-renewal.   These references are insufficient to establish that Plaintiff's non-renewal would not have occurred "but-for" her 2018 Complaint because MCCCD demonstrated other performance issues.   Nor can Plaintiff rely on temporal proximity to establish causation because the seven-month span between her 2018 Complaint and non-renewal is too distant as a matter of law.   *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)) (citing cases finding three and four-month periods are too long to support a causal link).

Although Plaintiff has shown she engaged in a protective activity and was subject to an adverse action thereafter, Plaintiff has not sufficiently shown her non-renewal occurred but-for her protected activity.   And even assuming *arguendo* that Plaintiff can make a *prima facie* case, her retaliation claim fails at the remaining steps of the three-step framework as discussed below.

### 2. MCCCD's Legitimate, Nonretaliatory Reasons and Pretext

The Court has already settled that MCCCD has provided sufficient, neutral reasons for Plaintiff's non-renewal.   *See supra* Section III.A(2).   And, the Court finds Plaintiff has not demonstrated that MCCCD's reasons were pretextual for retaliation.   Plaintiff has neither (1) directly persuaded the Court that a retaliatory reason more likely motivated MCCCD; nor (2) indirectly shown that MCCCD's "proffered explanation is unworthy of credence." *Campbell*, 892 F.3d at 1022 (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).   MCCCD cites to testimony showing MCCCD reminded Plaintiff she may file any complaints of discrimination, provided Plaintiff with information on how to do so according to the Faculty Policies, and encouraged her to do so professionally. (Doc. 62 at 9).   Moreover, the Court has already identified evidence in the summary judgment record reflecting that Plaintiff engaged at least some of the conduct that underpins MCCCD's neutral reasons for   Plaintiff's non-renewal.   *See supra* Section III.A(2).

The Court will therefore grant MCCCD summary judgment on Plaintiff's retaliation claim.

### C.     Hostile Work Environment

Plaintiff's last Title VII claim is for a hostile work environment.  Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to . . . create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted).  To establish a *prima facie* hostile work environment claim, a plaintiff must show "the defendants subjected [her] to verbal or physical conduct based on [her protected characteristic]; the conduct was unwelcome; and the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). Hostile work environment claims are examined under the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

As mentioned in the Court's 2022 Order, Plaintiff may rely on her hostile work environment allegations spanning from September 2017 to her non-renewal in May 2019. (Doc. 32 at 7).  Plaintiff argues various combined events demonstrate that MCCCD harassed her: "Plaintiff was [1] subjected to excessive scrutiny regarding her pay, [2] required to meet more often with her supervisor, [3] yelled at by college administrators on more than one occasion, [3] subjected to internal investigations with frivolous complaint, [4] harassed endlessly for information she provided regarding the Harvard conference." (Doc. 63 at 16).  Plaintiff further contends (5) MCCCD failed to address Plaintiff's fear for her physical safety.  (*Id.*)  MCCCD argues Plaintiff failed to show how these instances were objectively threatening, humiliating, offensive, or based on her protective characteristic.  MCCCD further contends Plaintiff's evidence rather shows that Plaintiff had numerous personality conflicts with other employees.  (Doc. 62 at 17).  The Court agrees with MCCCD.  Plaintiff does not sufficiently cite to the summary judgment record to demonstrate how her examples involved conduct that was based on her protected

1    characteristics and created an abusive working environment.

2         First, the record shows there is one instance where Plaintiff's overload pay was

3    delayed in January–February 2018 because her contract was not yet processed for that pay

4    period.  (Doc. 63-1 at 262–284).  Plaintiff's relevant email correspondence does not reflect

5    any verbal conduct based on her race or gender, nor can this isolated payroll delay be

6    considered abusive.

7         Second, while Plaintiff argues she felt "micromanaged" when Dean Orr met with

8    her thirteen times during one semester (Docs. 63 at 3; Doc. 63-1 at 257), Plaintiff has not

9    otherwise demonstrated how these meetings were threatening, humiliating, offensive, or

10   based on her protected characteristic.

11        Third, Plaintiff does not cite to any supporting evidence to show that she was yelled

12   at by her supervisor or what was said.[6]  (*See* Doc. 63 at 4).

13        Fourth, MCCCD's efforts to investigate complaints filed against Plaintiff cannot be

14   deemed to create a hostile work environment "when executed to remedy alleged

15   discrimination in the workplace."  *Doe No. 1 v. Wynn Resorts, Ltd.*, 2023 WL 1782439,

16   *11 (D. Nev. Feb. 3, 2023); *see also Corrales v. Chase Bankcard Services, Inc.*, 2007 WL

17   9724519, at *4 (D. Ariz. Feb. 20, 2007).

18        Fifth, the record shows Vice President Rivera and Dean Orr's inquiries regarding

19   Plaintiff's travel to the Harvard conference did not involve verbal conduct based on her

20   race or gender.  (*See* Doc. 63-1 at 270–281).  And no reasonable person could find that

21   multiple inquiries for paperwork is severe or pervasive to alter the conditions of her

22   employment.

23        Last, to claim she feared for her physical safety, Plaintiff cites to an email she

24   received from another MCCCD employee, Ms. Carlotta Abrams, stating Ms. Cutright told

25   Ms. Abrams that Dean Orr told Ms. Cutright that she wanted to fight Ms. Cutright.

26   (Doc. 63-1 at 670).  This triple hearsay statement had nothing to do with Plaintiff and

27
28   [6] As stated in the Court's Scheduling Order, "[n]o party shall presume the Court will hunt
     for facts or theories that might support either party's case. The Court will rely solely upon
     the attached evidence to verify facts asserted in the motion, response, or reply *as identified
     by a pin cite*."  (Doc. 37 at 5 n.1) (emphasis added).

1    cannot create a hostile work environment as a matter of law.

2           In sum, Plaintiff's allegations do not demonstrate her workplace was "permeated

3    with discriminatory intimidation, ridicule, and insult[.]"  *Harris*, 510 U.S. at 21.  Plaintiff

4    has not proffered any case law to support her purported hostile work environment theory.

5    (*See* Doc. 63 at 15–16).  Nor has Plaintiff identified any genuine factual dispute as to

6    "whether a reasonable [Hispanic woman] would find the workplace so objectively and

7    subjectively racially hostile as to create an abusive working environment."  *McGinest*, 360

8    F.3d at 1112.  The Court will therefore grant MCCCD summary judgment on Plaintiff's

9    hostile work environment claim.

10   **IV.    Conclusion**

11          For the reasons set forth above, the Court denies summary judgment on Plaintiff's

12   racial discrimination claim, but grants summary judgment in MCCCD's favor on Plaintiff's

13   retaliation and hostile work environment claims.

14          Accordingly,

15          **IT IS HEREBY ORDERED** that Defendant Maricopa County Community

16   College District's Motion for Summary Judgment is **GRANTED in part and DENIED**

17   **in part.** There being no just reason for delay, the Clerk of Court is kindly directed to enter

18   judgment under Federal Rule of Civil Procedure 54(b) dismissing Plaintiff's claims for

19   hostile work environment and retaliation.

20          **IT IS FINALLY ORDERED** that in light of the denial of summary judgment on

21   Plaintiff's racial discrimination claim under Title VII, the parties are directed to comply

22   with Paragraph 10 of the Rule 16 Scheduling Order (Doc. 37 at ¶ 10) regarding notice of

23   readiness for pretrial conference.  Upon a joint request, the parties may also seek a referral

24   from the Court for a settlement conference before a Magistrate Judge.

25          Dated this 15th day of March, 2024.

26                                              _____
                                                Honorable Diane J. Humetewa
27                                              United States District Judge

28